UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                        :
OEI HONG LEONG,                                                         :
                                                                        :
                                 Plaintiff,                             :
                                                                        :     13-CV-8655 (JMF)
            -v-                                                         :
                                                                        :     OPINION AND ORDER
THE GOLDMAN SACHS GROUP, INC.,                                          :
                                                                        :
                                 Defendant.                             :
                                                                        :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

   Plaintiff Oei Hong Leong, a Singaporean billionaire, sues the Goldman Sachs Group, Inc. ("GS Group"), the New York-based global investment bank conglomerate, alleging fraud and related torts in connection with certain investments he made in the foreign-exchange market. (Docket No. 1). GS Group now moves to compel arbitration in London and for a stay of the present case pending such arbitration. (Docket No. 18). In the alternative, Defendant moves to stay in favor of proceedings in Singapore. (*Id.*). Plaintiff cross-moves to strike two declarations submitted by GS Group in support of its motion. (Docket Nos. 23 and 24). For the reasons discussed below, Defendant's motion is granted and the case is stayed pending arbitration in London, and Plaintiff's motions to strike are denied.

## BACKGROUND

   The following facts are taken from the pleadings, as well as the declarations submitted in support of, and opposition to, the instant motion. *See, e.g.*, *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) ("In the context of motions to compel arbitration . . . , the court applies a standard similar to that applicable for a motion for summary judgment."). The facts are

undisputed except where noted, and all inferences are drawn in Plaintiff's favor.  *See, e.g.*, *Russell v. Mimeo, Inc.*, No. 08 Civ. 5354 (RJS), 2008 WL 6559743, at *1 (S.D.N.Y. Oct. 29, 2008).

### A.     Oei's Relationship With Goldman Sachs

Oei is a Singaporean billionaire who invested his wealth in reliance on the counsel of, among others, GS Group and its subsidiaries (collectively, "Goldman Sachs").  (Decl. Lee Ronald Suk Bae (Docket No. 20) ("Lee Decl.") ¶ 4; *see* Notice of Removal (Docket No. 1), Ex. A ("Compl.") ¶ 13).  In 2001, Oei entered a decade-long relationship with Goldman Sachs, which was formalized most recently through a series of overlapping contracts with several subparts — referred to collectively as the Client Agreement — executed by Oei on March 27, 2012.  (Compl. ¶ 13; Lee Decl., Ex. B ("Client Agreement"); *accord id.*, Ex. C).  In particular, Oei agreed to be bound by Parts A, B, C, E, and H of the Client Agreement with respect to Goldman Sachs International; because Part E incorporates Part D by reference, that Part also forms part of the contract between Oei and Goldman Sachs International.  (Client Agreement, Part A, § A).  Additionally, Oei agreed to a contract with Goldman Sachs (Asia) L.L.C. that comprised Parts A, B, C, D, and H of the Client Agreement.  (*Id.*).[1]

This byzantine draftsmanship aside, it is undisputed that Oei agreed to arbitrate "[a]ny dispute arising out of or connected with the [Client Agreement], between [himself] and [Goldman Sachs International] and/or [himself] and any Third Party Beneficiary, including a dispute as to . . . the Transactions contemplated hereby[ or] the Accounts established hereunder."

---

[1]     Oei also agreed to separate contracts with Goldman, Sachs & Co. and Goldman Sachs Bank (Europe) PLC.  Unlike the other agreements, Oei's account agreement with Goldman, Sachs & Co. called for arbitration in New York.  (Client Agreement 85).  That provision was not incorporated into the other contracts.  (Client Agreement, Part A, § A).

2

(*Id.* 82).  The term "Third Party Beneficiary" is defined to include any "Affiliate," which, in turn, is defined to include any "entity that controls, directly or indirectly," Goldman Sachs (Asia), L.L.C. ("Goldman Sachs Asia").  (*Id.* Part A § B).  That category includes GS Group, Defendant here, which is the ultimate parent of Goldman Sachs Asia.  (Lee Decl. ¶ 1; Compl. ¶ 3).  The Client Agreement provides that such arbitration must take place in England according to the rules of the London Court of International Arbitration, which were incorporated into the Client Agreement by reference.  (Client Agreement, Part E, § 12.3).  Oei's contracts with both Goldman Sachs International and Goldman Sachs Asia are, by their terms, "to be governed by the laws of England and Wales."  (*Id.*, Part A, § A).

**B.     The Carry Trades**

Oei alleges that in 2011 he "decided to stop virtually all financial dealings with Goldman Sachs and its subsidiaries" because of a losing trade in which he claims Goldman Sachs profited.  (Compl. ¶ 16).  In April 2012, several Goldman Sachs employees endeavored to win back Oei's business.  (Compl. ¶¶ 17-20, 23-24).  According to the Complaint, a key part of their campaign was an April 24, 2012 dinner at Oei's home.  (Compl. ¶ 18).  In attendance at the dinner were, among others, Gary Cohn, president and COO of Goldman Sachs; David Ryan, president of Goldman Sachs Asia; Ronald Lee, head of Goldman Sachs Private Wealth Management Group in Asia (excluding Japan); and Vivien Webb, managing director of Goldman Sachs Private Wealth Management Group in Asia.  (*Id.*).  During the dinner, Cohn allegedly told Plaintiff that "Goldman Sachs would ensure that its employees and subsidiaries provided [him] with the best possible service, that he would personally make sure that Goldman Sachs and its employees and subsidiaries fulfilled their fiduciary responsibility to [him,] and that they would treat him fairly and honestly."  (Compl. ¶ 19).

Over the following weeks, employees of Goldman Sachs Asia continued to market their services to Oei. (Compl. ¶¶ 20, 27-29). Most notable were the efforts of Goldman Sachs Asia employee Mats Dewitte. (Compl. ¶¶ 28-46). After two meetings with Dewitte, Oei agreed to purchase a series of currency options that together constituted a "carry trade." (Lee Decl. ¶ 10; *id.* Ex. F). Although Oei had previously entered into trades that were "short" the Japanese Yen and "long" the United States Dollar — that is, bets that would earn Oei money if the Dollar rose in value relative to the Yen — Dewitte and other Goldman Sachs Asia employees persuaded Oei to enter a similar deal with the Brazilian Real, a currency with which Oei was relatively unfamiliar, in lieu of the United States Dollar. (Lee Decl. ¶¶ 10-11; Compl. ¶ 33). The result was that Oei stood to gain if the Brazilian Real appreciated relative to the Japanese Yen, but faced losses if the opposite occurred. (Lee Decl. ¶¶ 10-11; *see also id.*, Ex. F). The transaction was completed on May 15, 2013. (Lee Decl. ¶ 11).

Oei was quickly stricken with buyer's remorse. He sought to unwind the trades only six days after entering into them, but Goldman Sachs told him that it would cost $18,000,000 to do so, apparently due to lack of liquidity in the market for the type options Oei held. (Compl. ¶¶ 65-70). Apparently fazed by the steep cost of a quick exit from his positions, Oei did not unwind his trades until June 17, 2013. By that time, Oei had been forced to pay six margin calls, and the transactions collectively cost him $34,299,037. (Compl. ¶¶ 98, 113; *accord* Lee Decl. ¶ 12 ("[T]he cost to Mr. Oei was substantial."); *id.*, Ex. G (accounting for the losses)).

C.     **The Singapore Lawsuit**

On July 5, 2013, Oei wrote a letter to Goldman Sachs Asia, addressed to "Roland S. Lee," threatening to sue for his losses. (Lee Decl., Ex. H, ¶ 12). On September 20, 2013, Oei made good on his threat and filed suit against another Goldman Sachs affiliate, Goldman Sachs

International, in the High Court of the Republic of Singapore. (Lee Decl. ¶ 14; *id.*, Ex. I). (The choice to sue Goldman Sachs International, as opposed to Goldman Sachs Asia, was and is unexplained.) Oei's Singapore lawsuit challenges the same trades as the instant lawsuit, and contains many of the same factual allegations, but omits any reference to Cohn or any other employee of GS Group. (*See generally id.*, Ex. I). In Singapore, Goldman Sachs International argued that Oei was bound by the arbitration agreement contained in the Client Agreement. (Lee Decl. ¶ 15). On January 20, 2014, a court in Singapore granted Goldman Sachs International's application to stay the suit pending the outcome of arbitration proceedings in London. (*Id.*, Ex. R). On January 29, 2014, Oei appealed that stay order (Decl. Siraj Omar (Docket No. 22-1) ¶¶ 6-7; *id.*, Ex. D), but subsequently failed to perfect the appeal; the Singaporean judgment is now final. (Docket Nos. 30-31; Docket No. 32, Ex. A).[2]

**D.    The Instant Lawsuit**

On December 4, 2013, Plaintiff filed the instant lawsuit against GS Group in New York State Supreme Court (Notice of Removal (Docket No. 1) 40), alleging nine causes of action: fraudulent misrepresentation, aiding and abetting the same, corporate malfeasance, breach of fiduciary duty, aiding and abetting the same, unjust enrichment, fraudulent inducement, and aiding and abetting the same. (Compl. ¶¶ 115-91). More specifically, Plaintiff alleges that Defendant had a duty to provide him with all relevant information about the carry trades — including the cost to unwind the trades, the liquidity of the market for the options involved, the various market risks involved in the trade, and the nature of his relationship with Goldman Sachs — and that GS Group violated that duty. (*See, e.g., id.* ¶¶ 116-31). He also complains about,

---

[2]    As a result, Defendant's alternative motion to stay this action pending the proceedings in Singapore is moot.

5

among other things, the strike prices chosen by Goldman Sachs and the mark-to-market accounting used by Goldman Sachs to price the options — on the ground that they enabled Goldman Sachs to profit at his expense.  (*Id*. ¶¶ 49-60).  Plaintiff seeks compensatory and punitive damages.  (*Id*. ¶¶ 192-97).

The day after Plaintiff filed his Complaint, before it was served, GS Group removed the action to this Court.  (Docket No. 1).  *See Flores v. Merck & Co. (In re Fosamax Prods. Liab. Litig.)*, MDL No. 1789 (JFK), 2008 WL 2940560, at *3 (noting the inapplicability of the home-state defendant exception "where an in-state defendant has not been served by the time the removal petition is filed").  On January 23, 2014, GS Group moved to stay in favor of arbitration in London.  (Docket No. 18).  In support of its motion, GS Group submitted declarations by David Joseph, an English lawyer offering his opinion on the application of English law to the facts of this case (Docket No. 21), as well as Lee Ronald Suk Bae, a Managing Director of Goldman Sachs Asia (Docket No. 20).  The latter declaration serves primarily as the vehicle through which to submit and authenticate the relevant business records necessary to decide this motion.  On February 18, 2014, Oei moved to strike the Joseph declaration in its entirety (Docket No. 23), and the Lee declaration in part (Docket No. 24).

## MOTIONS TO STRIKE

Plaintiff moves to strike the Joseph Declaration on the ground that "it contains improper conclusory legal statements and it incorporates incorrect factual allegations" (Mot. To Exclude Decl. David Joseph QC (Docket No. 24) 1), and the Lee declaration on the ground that it is not based on personal knowledge (Mot. To Exclude Portions Decl. Lee Ronald Suk Bae (Docket No. 23) ("Pl.'s Mot. Exclude Lee") 1).  Both motions are substantially without merit.  First, as to the Joseph Declaration, Federal Rule of Civil Procedure 44.1 provides that, "[i]n determining foreign

law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.  The court's determination must be treated as a ruling on a question of law."  Because the Joseph Declaration is "testimony . . . submitted by a party" for purposes of "determining foreign law," its submission in connection with this motion is appropriate.  *See, e.g.*, *Curley v. AMR Corp.*, 153 F.3d 5, 13 (2d Cir. 1998) ("We urge district courts to invoke the flexible provisions of Rule 44.1 to determine issues relating to the law of foreign nations.").  Moreover, Plaintiff identifies no basis on which to discredit the declaration submitted by Joseph, a well-credentialed member of the Queen's Counsel (Expert Decl. David Joseph QC (Docket NO. 21) ("Joseph Decl.") ¶ 1), other than his affiliation with Defendant in this case.  That affiliation may affect the weight to be given the declaration, but it does not render it inadmissible.  *See, e.g.*, *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 92 (2d Cir. 1998) ("In cases [involving foreign-law experts], it is not the credibility of the experts that is at issue, it is the persuasive force of the opinions they express[]."); *Bodum USA, Inc. v. La Cafetiere, Inc.*, 621 F.3d 624, 629 (7th Cir. 2010) (noting that a court should "discount" — but not exclude — declarations on foreign law submitted by the parties' experts).  Accordingly, Plaintiff's motion to strike the Joseph Declaration is denied.

Second, as noted, the Lee Declaration is primarily offered for the purpose of authenticating and submitting the contracts and other documents necessary to decide this motion.  Indeed, Plaintiff himself concedes that the Lee Declaration is proper in that regard.  (Pl.'s Mot. Exclude Lee 3 n.3).  (In fact, as the relevant standard — discussed below — is akin to that governing summary judgment, Plaintiff's failure to submit a similar declaration renders most of the substance of Lee's declaration undisputed.)  Although Plaintiff is correct that declarations must generally contain information about which the declarant has personal knowledge, *see* Fed.

7

R. Evid. 602, there is ample indication that Lee, as the Managing Director of Goldman Sachs Asia that Plaintiff personally threatened with this very lawsuit, has personal knowledge of the facts stated in his declaration.  Nevertheless, out of an abundance of caution, the Court declines to rely on or reference in any way Paragraph 9 of the Lee Declaration, which contains the statements least likely supported by personal knowledge — specifically, that Webb and Dewitte did not have apparent authority to make representations on behalf of GS Group.

## MOTION TO STAY IN FAVOR OF ARBITRATION

The Court turns, then, to Defendant's motion to stay.  As the party seeking to compel arbitration, GS Group bears the burden of showing the existence of a valid agreement to arbitrate.  *See, e.g.*, *Tellium, Inc. v. Corning Inc.*, No. 03 Civ. 8487 (NRB), 2004 WL 307238, at *5 (S.D.N.Y. Feb. 13, 2004).  The Court evaluates such a motion "under a standard similar to the standard for a summary judgment motion."  *Russell*, 2008 WL 6559743, at *1.[3]  Thus, to prevail on its motion, GS Group must demonstrate that there is no genuine dispute as to any material fact and that it is entitled to an order staying the case as a matter of law.  *See* Fed. R. Civ. P. 56(a). Despite Oei's assertions to the contrary (Oei Hong Leong's Mem. Law Opp'n Goldman Sachs Group, Inc.'s Mot. To Stay Favor Arbitration or, Alternatively, To Stay or Dismiss Favor Foreign Proceedings (Docket No. 22) ("Pl.'s Mem.") 7-9), English law governs that inquiry, as the Client Agreement expressly provides, in relevant part, that is "to be governed by the laws of England and Wales."  (Client Agreement, Part A, § A).  Thus, Defendant's burden is to show

---

[3]     Plaintiff argues that "the relevant facts to be considered are those set forth in Mr. Oei's Complaint."  (Oei Hong Leong's Mem. Law Opp'n Goldman Sachs Group, Inc.'s Mot. To Stay Favor Arbitration, Alternatively, To Stay Dismiss Favor Foreign Proceedings (Docket No. 22) 6).  That argument would be true if the standard governing motions to compel arbitration were akin to that governing motions *to dismiss*, rather than motions for summary judgment.  That is not the case.  *See Russell*, 2008 WL 6559743, at *1.

that, under English law, the contract unambiguously constitutes an agreement to arbitrate.  *See, e.g.*, *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 51 (2d Cir. 2004).

It has done so.  Under English law, "arbitration clauses should be construed as broadly as possible."  *Fiona Trust & Holding Corp. v. Privalov*, [2008] 1 Lloyd's Rep. 254 260 (Lord Hope of Craighead) (Joseph Decl., Ex. 9, at 260); *see also, e.g.*, *Martinez v. Bloomberg LP*, 883 F. Supp. 2d 511, 517-18 (S.D.N.Y. 2012), *aff'd*, 740 F.3d 211, 224-25 (2d Cir. 2014).  In the absence of an agreement to commit the question of arbitrability to the arbitrator, the question of whether a particular dispute is covered by an otherwise valid arbitration clause — like the formation of the arbitration clause itself — is a question for judicial determination.  *See, e.g.*, *Granite Rock Co. v. Int'l B'hood of Teamsters*, 561 U.S. 287, 296 (2010).  Here, the language of the Client Agreement makes clear that Oei agreed to arbitrate at least some of his disputes with Goldman Sachs International and Goldman Sachs Asia.  (Client Agreement 82).  It further makes clear that such agreement applies to covered disputes between Oei and "any Third Party Beneficiary" (*id.*), a term that is defined to include "any Affiliates" (*id.* at 6; *see also id.* at 23 ("Any Third Party Beneficiary may enforce and rely on any term of the Agreement conferring a benefit on it to the same extent as if it were a party to the Agreement.")).  "Affiliates," in turn, are defined to include "any entity that controls, directly or indirectly," Goldman Sachs Asia.  (*Id.* at 1).  It is undisputed that GS Group is the ultimate parent of Goldman Sachs Asia.  (Lee Decl. ¶ 1).

Under the English Contracts (Rights of Third Parties) Act 1999, third parties may enforce contractual terms if "the contract expressly provides" that they may do so.  Contracts (Rights of Third Parties) Act, 1999, c. 31, § 1 (Eng.).  (Joseph Decl., Ex. 5, § 1).  Here, as discussed, the terms of the Client Agreement expressly and unambiguously provide that GS Group, as the

parent of Goldman Sachs Asia, may rely on the substantive terms of the Client Agreement. (Client Agreement 23). Moreover, Section 8(2) of the same statute provides that any third party may stand in the shoes of the signatory and compel arbitration of any substantive right covered by an arbitration clause. Contracts (Rights of Third Parties) Act, 1999, c. 31, § 8(1) (Eng.). (Joseph Decl., Ex. 5, § 8(2)).[4] Finally, despite Oei's arguments to the contrary (Pl.'s Mem. 15-16), the language of the arbitration provision covers the present dispute, which is plainly one concerning "Transactions contemplated" or "Accounts established" under the Client Agreement. (Client Agreement, Part E, § 12.3). That is true whether the relevant contract is the one between Oei and Goldman Sachs International or Goldman Sachs Asia; in either case, the dispute must be submitted to arbitration in London under the terms of Part E of the Client Agreement.[5]

Plaintiff's arguments to the contrary are without merit. First, Plaintiff argues that he cannot be compelled to arbitrate because GS Group is not a "signatory" to any portion of the Client Agreement. (Pl.'s Mem. 12-15). But as the Contracts (Rights of Third Parties) Act 1999 makes clear, third parties may enforce contractual terms if, as here, the contract expressly provides that they may do so. Plaintiff also argues that the present dispute is not covered by the broad arbitration clause he signed. (*Id.* at 15-16). That argument is premised on the fact that Cohn made personal promises to him, and on the idea that his entire Complaint is based on a handful of general and largely unenforceable promises made over dinner. (*Id.*). But as Defendant argues (The Goldman Sachs Group, Inc.'s Reply Mem. Law Further Supp. Mot. To

---

[4] Part C, Section 17.4 of the Client Agreement explicitly references the Contracts (Rights of Third Parties) Act 1999 and provides that any rights arising under the Client Agreement in virtue of that statute are personal to the relevant third-party beneficiary (or beneficiaries).

[5] Although Part C of the Client Agreement, a part creating a standalone contract between Oei and Goldman, Sachs & Co., calls for arbitration to take place in New York, none of the allegations at issue in the Complaint implicate that contract. (*See* Lee Decl. ¶ 5).

10

Stay Favor Arbitration, Alternatively, To Stay Dismiss Favor Foreign Proceedings (Docket No. 26) 4), Plaintiff spends conspicuously few words describing Cohn's statements, which he now characterizes as the entire basis of his lawsuit. Moreover, even if Plaintiff's convenient but inaccurate characterization of his own Complaint were accurate, Cohn's general statements are undoubtedly related to "Transactions contemplated" or "Accounts established" under the Client Agreement. The fact that those statements may shed some light on the nature of the parties' agreement does not alter the conclusion that Plaintiff agreed to be bound by its terms.

## CONCLUSION

In the interest of avoiding unnecessary delay of the arbitral process, the Court hereby determines, for the reasons stated above, that a stay, pursuant to Title 9, United States Code, Section 3, is appropriate in this instance. *See, e.g.*, *LaVoice v. UBS Fin. Servs.*, No. 11 Civ. 2308 (KMW), 2013 WL 5380759, at *1 (S.D.N.Y. Sept. 26, 2013) (explaining that stays in favor of arbitration are the "preferred approach in this Circuit because dismissals are appealable orders, and thus may delay the arbitral process"). Accordingly, Defendant's motion for a stay pending arbitration to take place at the London Court of International Arbitration is GRANTED. Plaintiff's motions to strike are DENIED.

The Clerk of Court is directed to terminate Docket Numbers 2, 18, 23, and 24. Further, as there is no reason to keep the case open pending the arbitration, the Clerk of Court is directed to administratively close the case without prejudice to either party moving by letter motion to reopen the case within 30 days of the conclusion of the arbitration proceedings.

SO ORDERED.

Dated: June 25, 2014
      New York, New York

                                                  JESSE M. FURMAN
                                           United States District Judge